UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-CV-81071-RAR

**OTTIS LEE HAM**,

    Plaintiff,

v.

**SERGEANT SALMON,** *et al.*,

    Defendants.
_____/

## ORDER GRANTING SERGEANT JOHNSON & WARDEN ACOSTA'S MOTIONS TO DISMISS

**THIS CAUSE** comes before the Court on two motions to dismiss filed by two of the three individual defendants named in this action. Defendant Sergeant Eric Johnson ("Sgt. Johnson") filed a Motion to Dismiss [ECF No. 72] to which Plaintiff filed a Response [ECF No. 78] and Defendant Johnson filed a Reply [ECF No. 79] (the "Johnson Motion, Response, and Reply," respectively). Defendant Warden Francisco Acosta ("Warden Acosta") filed his own Motion to Dismiss [ECF No. 80] which garnered its own Response [ECF No. 84] and Reply [ECF No. 93] (the "Acosta Motion, Response, and Reply" respectively). Both Motions seek the dismissal of Plaintiff's claims against them pursuant to Fed. R. Civ. P. 12(b). After reviewing the respective pleadings, the Court **GRANTS** both Motions to Dismiss [ECF No. 72, 80].

## FACTUAL ALLEGATIONS

### A. Allegations in the Third Amended Complaint

The Court will begin by briefly recounting the allegations in Plaintiff's Third Amended Complaint ("TAC"), [ECF No. 58], that relate to Sgt. Johnson and Warden Acosta. Plaintiff, Ottis Lee Ham, is an inmate in the custody of the Florida Department of Corrections ("FDOC"). TAC

at ¶ 1.  In the early morning hours of June 12, 2017, Plaintiff was preparing to be transferred by bus from the South Florida Reception Center in Doral, Florida, to South Bay Correctional Facility ("South Bay C.F.") in South Bay, Florida.  *Id.* at ¶¶ 1, 18.  Before boarding the bus, the soon-to-be transferred inmates were required to have their property inventoried by either Sergeant Joseph Salmon ("Sgt. Salmon") or Sgt. Johnson.  *Id.* at ¶¶ 19, 21.  While inventorying Plaintiff's property, Sgt. Salmon confronted Plaintiff about a "silver metal watch"—Plaintiff insisted that the watch was on his "property list," but Sgt. Salmon did not believe him.  *Id.* at ¶ 20.  After consulting an unnamed Captain, Sgt. Salmon escorted Plaintiff to the property room and asked Sgt. Johnson to retrieve Plaintiff's property list.  *Id.* at ¶¶ 21–24.  When the list showed that the watch indeed belonged to Plaintiff, Sgt. Salmon remarked that "[y]ou know what, I don't give a fuck if it's on there, give me the fucking watch!"  *Id.* at ¶¶ 25–26.

Instead of giving Sgt. Salmon the watch, Plaintiff asked to speak to the Captain.  *Id.* at ¶ 27.  At that point, Sgt. Salmon exclaimed "I'll beat your ass, boy!" and proceeded to punch Plaintiff in the face with a closed fist.  *Id.* at ¶¶ 27, 31–34.  Sgt. Salmon then "grabb[ed] Mr. Ham's left wrist with both hands, [lifted] Mr. Ham's left arm upward, and then pulled downward and twisted Mr. Ham's left arm until his left forearm snapped."  *Id.* at ¶ 37.  Plaintiff noted that the bone in his left forearm was "protruding upward from underneath his skin—though the bone did not break through Mr. Ham's skin."  *Id.* at ¶ 39.  Sgt. Johnson heard and observed "the entirety of Sgt. Salmon's use of force against Mr. Ham," but did nothing to prevent, stop, or mitigate Sgt. Salmon's actions.  *Id.* at ¶¶ 30, 40–46.  Nor did Sgt. Johnson seek or attempt to seek any medical treatment for Plaintiff's injury, even though Sgt. Johnson purportedly knew that Plaintiff had been injured.  *Id.* at ¶ 57.

Upon arriving at South Bay C.F., correctional personnel noticed Plaintiff's injured arm and approved an emergency transfer to a nearby medical center. *Id.* at ¶¶ 60, 63–66. The emergency room doctor, Dr. Adam Leroy, diagnosed Plaintiff with a forearm fracture, informed Plaintiff that he required reconstructive surgery, and opined to the transporting officers that "Mr. Ham could not have received the type of injury he did from a fall, and that someone twisting the arm is the only way Mr. Ham could have received the type of injury he suffered." *Id.* at ¶¶ 67–71. Plaintiff received orthopedic surgery on his fractured left forearm from Dr. Thomas Saylor, who also opined that the injury could have only occurred due to the "physical twisting of the arm." *Id.* at ¶¶ 72–74.

The TAC also sets forth allegations against Warden Acosta, the warden of the South Florida Reception Center at the time the incident allegedly occurred. Plaintiff alleges that there were at least two other instances of Sgt. Salmon using excessive force against other inmates at the South Florida Reception Center and that Warden Acosta failed to adequately train, supervise, or discipline Sgt. Salmon for his "obvious, flagrant, rampant, and continued constitutional violations of inmates." *Id.* at ¶¶ 96–100. Plaintiff further asserts that Warden Acosta knew about Sgt. Salmon's history of excessive force, and that Warden Acosta's failure to train and supervise Sgt. Salmon was a direct and proximate cause of Plaintiff's injuries. *Id.* at ¶¶ 131–35.

### B. Plaintiff's Grievance History

On June 13, 2017, the day after Sgt. Salmon's alleged use of force, the Assistant Warden of South Bay C.F. interviewed Plaintiff about the incident. *Id.* at ¶ 75. The day after that, June 14, 2017, Plaintiff submitted a grievance to prison officials. *Id.* at ¶ 76. On July 17, 2017, Plaintiff filed another grievance with the FDOC regarding the June 12, 2017 incident with Sgt. Salmon. *Id.* at ¶ 77; *see also* July 17, 2017 Grievance [ECF No. 58] at 40–41. In this July 17, 2017 Grievance,

Plaintiff alleged that "[Sgt. Salmon] broke my arm by twisting it with anger." July 17, 2017 Grievance [ECF No. 58] at 40. Plaintiff also mentioned that he had previously submitted a grievance on June 14, 2017, but that he did not receive a response until July 17, 2017. *Id.*

In a response dated July 26, 2017, Plaintiff was informed that "your allegations of physical abuse issue has [sic] been referred to the [Office of the Inspector General] for appropriate action which you filed prior to this grievance. Based on the foregoing information your grievance is denied." Response to July 17, 2017 Grievance [ECF No. 58] at 42; *see also* TAC at ¶ 78. In January of 2019, Plaintiff was interviewed by "Mr. Nicholson," an inspector with the Office of the Inspector General ("OIG"). TAC at ¶ 79. On June 16, 2019, Plaintiff wrote a letter to OIG, requesting an update regarding its investigation. *Id.* at ¶ 80; Letter to OIG [ECF No. 58] at 43. The OIG responded on May 23, 2019, informing Plaintiff that he would have to formally direct a public records request to his classification officer. May 23, 2019 OIG Letter [ECF No. 58] at 44. Plaintiff "appealed" this May 23, 2019 letter to the Secretary of FDOC on June 16, 2019, complaining that the investigation had been ongoing for nearly two years without a resolution. June 16, 2019 Appeal [ECF No. 58] at 45. The Secretary responded that "questions regarding an Inspector General's investigation" must be addressed to the institutional inspector and that the appeal would be "returned without action." Response to Appeal [ECF No. 58] at 46.

After receiving the Secretary's response, Plaintiff submitted another request to an inspector asking for the "investigative report number for this active investigation," "whom this case has been assigned to," and "why this case has not been turn[ed] over to the State Attorney's Office." Inmate Request Form [ECF No. 58] at 47. The Inmate Request was returned to Plaintiff on August 19, 2019 with an update: "Still an Open/Active Case by OIG." *Id.*; *see also* TAC at ¶¶ 84–85. Plaintiff

contends that he has not received any further updates about any investigation undertaken by the OIG or FDOC. TAC at ¶ 86.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must include 'enough facts to state a claim to relief that is plausible on its face.'" *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept as true all factual allegations contained in the complaint, and the plaintiff should receive the benefit of all favorable inferences that can be drawn from the facts alleged. *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1335 (11th Cir. 2012); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the court is required to accept as true all allegations contained in the complaint, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quotation omitted).

In ruling on a motion to dismiss, "[a] court is generally limited to reviewing what is within the four corners of the complaint." *Austin v. Modern Woodman of Am.*, 275 F. App'x 925, 926 (11th Cir. 2008) (quoting *Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1329 n.7 (11th Cir. 2006)). This includes attachments or exhibits provided with the complaint. *See Gill as Next Friend of K.C.R. v. Judd*, 941 F.3d 504, 511 (11th Cir. 2019) ("The Civil Rules provide that an attachment to a complaint generally becomes 'part of the pleading for all purposes,' including for ruling on a motion to dismiss.") (citing Fed. R. Civ. P. 10(c)). A court may also "consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed," meaning the authenticity of the document is not challenged. *Day v. Taylor,* 400 F.3d 1272, 1276 (11th Cir.

2005) (citing *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002)).  Further, "a document need not be physically attached to a pleading to be incorporated by reference into it; if the document's contents are alleged in a complaint and no party questions those contents, [the court] may consider such a document provided it meets the centrality requirement[.]" *Id.*

## ANALYSIS

Plaintiff's TAC alleges five counts against three different defendants for purportedly violating his constitutional rights.  Three of those five counts are against Sgt. Johnson and Warden Acosta.  In Count 3, Plaintiff argues that Sgt. Johnson observed Sgt. Salmon's use of excessive force yet failed to intervene or otherwise make an attempt to stop the unconstitutional use of force. *See* TAC at ¶¶ 114–20.  Count 4 presents a deliberate indifference claim against Sgt. Johnson and asserts that Sgt. Johnson deliberately refused to provide Plaintiff with medical attention, even though Sgt. Johnson was aware that Plaintiff had been seriously injured by Sgt. Salmon. *See id.* at ¶¶ 121–27.  Finally, in Count 5, Plaintiff asserts a supervisory liability claim against Warden Acosta for failing to adequately train or supervise Sgt. Salmon. *See id.* at ¶¶ 128–35.

Both Sgt. Johnson and Warden Acosta argue that the claims against them should be dismissed because Plaintiff failed to exhaust his administrative remedies with FDOC as required by the Prison Litigation Reform Act (the "PLRA").  Johnson Motion at 3 (citing 42 U.S.C. § 1997e(a)); Acosta Motion at 5–8.[1]  The PLRA was passed by Congress, at least in part, to "reduce the quantity and improve the quality of prisoner suits." *Porter v. Nussle*, 534 U.S. 516, 524 (2002).  The "centerpiece" of the PLRA's effort to accomplish this goal was to create an "'invigorated' exhaustion provision" by requiring state prisoners to exhaust all remedies made available by the

---

[1] Both Defendants provide additional arguments in favor of dismissing the claims against them, but the Court declines to reach these issues since Plaintiff's failure to exhaust is ultimately dispositive. *See Bryant v. Rich*, 530 F.3d 1368, 1374 (11th Cir. 2008) ("Exhaustion of administrative remedies is a matter in abatement, and ordinarily does not deal with the merits." (cleaned up))

state—even if the relief sought "cannot be granted by the administrative process." *Woodford v. Ngo*, 548 U.S. 81, 84–85 (2006). The PLRA specifically commands any person challenging their prison conditions to exhaust their remedies before filing suit, while also requiring the district court to dismiss any case where the plaintiff has failed to do so. 42 U.S.C. § 1997e(a)–(c). The failure to exhaust is an affirmative defense and "inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock*, 549 U.S. 199, 216 (2007).

The Eleventh Circuit has devised a two-step process to analyze a failure to exhaust defense. "First, the court looks to the factual allegations in the defendant's motion to dismiss and those in the plaintiff's response, and if they conflict, takes the plaintiff's version of the facts as true." *Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir. 2008). If the plaintiff's version of the facts show that he failed to exhaust his administrative remedies, then "the complaint [must be] dismissed for failure to exhaust administrative remedies." *Id.*; *see also Okpala v. Drew*, 248 F. App'x 72, 73 (11th Cir. 2007) (noting that dismissing a complaint is appropriate when the "failure to exhaust administrative remedies—an affirmative defense—[is] clear from the face of the complaint." (citing *Jones*, 549 U.S. at 920–21)). If the complaint survives this first step, the defendant bears the burden of proof to show that the plaintiff failed to exhaust his administrative remedies. *Turner*, 541 F.3d at 1082. The court must then "make specific findings in order to resolve the disputed factual issues related to exhaustion," and then, based on those factual findings, determine whether the prisoner has exhausted his or her remedies. *Id.* at 1082–83.

After conducting the *Turner* two-step analysis, the Court concludes that Defendants have met their burden in showing that Plaintiff did not properly exhaust his administrative remedies against Sgt. Johnson and Warden Acosta.

### A. Step One: The TAC Demonstrates Exhaustion on its Face

Chapter 33-103 of the Florida Administrative Code outlines the procedure under which an inmate in the custody of the FDOC may seek redress of a grievance. Generally, the FDOC's regulations require an inmate to follow a three-step process: "(1) file an informal grievance to the staff member responsible for the particular area of the problem; (2) file a formal grievance with the warden's office; and (3) submit an appeal to the Office of the Secretary of the FDOC." *Parzyck v. Prison Health Servs., Inc.*, 627 F.3d 1215, 1218 (11th Cir. 2010) (cleaned up); *accord* Fla. Admin. Code. rr. 33-103.005–.007. The OIG is responsible for investigating any allegation that an inmate "has been unlawfully abused or is the subject of sexual misconduct." Fla. Stat. § 944.35(3)(d); *see also* Fla. Admin. Code r. 33-103.001(3) (requiring prison officials to report any grievance "contain[ing] any allegation of physical abuse, excessive force, or sexual abuse" to OIG, even if the grievance qualifies as "contraband" under prison regulations).

The Court begins by noting that, from the face of the TAC, Plaintiff did not complete the three-step grievance process required by Florida law. While Plaintiff alleges that he submitted an informal grievance on June 14, 2017, followed by a formal grievance on July 17, 2017, he did not timely appeal the denial of his formal grievance to the FDOC Secretary. *See* TAC at ¶¶ 76–78.[2] This failure to complete the third step, however, is not necessarily fatal since the matter was referred to OIG. Federal district courts throughout the State of Florida have found that a prisoner exhausts his administrative remedies if he or she starts the grievance process set forth in the Florida Administrative Code <u>and then</u> has that grievance referred to the OIG. *See Lanier v. Smith*, No. 08-cv-833, 2009 WL 1758904, at *1 (M.D. Fla. June 19, 2009) ("Upon review of the record before

---

[2] At the motion to dismiss stage, the Court assumes that Plaintiff's June 14, 2017 grievance (which is not provided as an exhibit attached to the TAC) is an informal grievance as required by FDOC's regulations. *See Turner*, 541 F.3d at 1082.

the Court, Plaintiff was informed on three occasions that the matter had been referred to [OIG]. Since the matter was referred to [OIG] for review and consideration, Defendants' Motion to Dismiss will be denied." (internal citation omitted)); *cf. Fleming v. Espino*, No. 3:20-cv-853-MMH-JRK, 2021 WL 5083743, at *7 (M.D. Fla. Nov. 2, 2021) (finding that plaintiff had failed to exhaust his remedies since "[t]here is no evidence supporting even an inference that the OIG's investigation was a result of Fleming filing a grievance.").

Unfortunately, the case law surrounding this issue is confusing, unsettled, and even contradictory. For example, one district judge in the Middle District of Florida found that "once the FDOC referred his emergency grievance to the [OIG]—Plaintiff was not required to pursue subsequent stages of the administrative grievance process or wait for the conclusion of the Inspector General's investigation." *Hardin v. Jones*, No. 18-cv-3, 2020 WL 325649, at *4 (M.D. Fla. Jan. 21, 2020). Yet another district judge from that same court concluded "the fact that the matter was referred to the [OIG] did not absolve Plaintiff of his obligation to follow the applicable exhaustion procedures." *Lane v. Batchelor*, No. 19-cv-1836, 2021 WL 4169404, at *4 (M.D. Fla. Sept. 14, 2021). So, which one is it? Is a prisoner obligated to dutifully follow the usual three-step procedure laid out in the Florida Administrative Code—even when the matter has been referred to OIG? Or is the three-step process waived once the OIG becomes involved?

In this particular case, the Court is satisfied that the referral of Plaintiff's grievance to OIG validly excused him from filing a timely appeal to the FDOC Secretary. The Court finds the Northern District of Florida's decision in *Luckey v. May*, No. 14-cv-315, 2016 WL 1128426 (N.D. Fla. Feb. 17, 2016), *report and recommendation adopted*, 2016 WL 1169481 (N.D. Fla. Mar. 22, 2016) to be particularly instructive. In that case, the plaintiff filed an informal grievance—the first step in the normal three-step process—which was subsequently referred to OIG. *Luckey*, 2016

WL 1128426, at *10. In responding to the informal grievance, prison officials informed the plaintiff that "[a]s action has been initiated, you may consider your appeal approved from that standpoint." *Id.* The court concluded, based on the referral to OIG constituting approval of his grievance, that "Plaintiff was successful at the first stage of the grievance procedure and was not required to pursue subsequent stages." *Id.*

The Court is cognizant that there is case law that stands in opposition to *Luckey*, particularly *Hope v. Walker*, No. 13-cv-362, 2015 WL 5190435 (N.D. Fla. Aug. 18, 2015), *report and recommendation adopted*, 2015 WL 5190615 (N.D. Fla. Sept. 4, 2015). In *Hope*, the district court recognized that plaintiff had filed a grievance that was "reported to [OIG] for further investigation." *Id.* at *4. The prison's response, however, also stated that the grievance was "denied" and informed the plaintiff that administrative review of the denial was available; therefore, the court concluded that "the referral of plaintiff's allegations to [OIG] does not eliminate the requirement that he exhaust his administrative remedies." *Id.* at *4–5; *see also Luckey*, 2016 WL 1128426, at *11 n.6 (distinguishing itself from *Hope* since that grievance "was denied").

When comparing the facts of *Hope* and *Luckey* to the instant case, *Hope* appears to be directly on point. After all, the response to Plaintiff's formal grievance explicitly said that it was "denied" and informed Plaintiff how to "obtain further administrative review," which is the exact same posture of the grievance in *Hope*. *Compare* Response to July 17, 2017 Grievance [ECF No. 58] at 42, *with Hope*, 2015 WL 5190435, at *4. However, the Court finds this dichotomy between *Hope* and *Luckey* to be unwieldy and unworkable.

As far as the Court can tell, the facts in *Hope* and *Luckey* are nearly identical. Both plaintiffs filed a grievance alleging physical abuse. *See Hope*, 2015 WL 5190435, at *1 (alleging

that prison guards "sprayed plaintiff with chemical agents," "punched plaintiff in the lower jaw," and "[made] him fall to the ground hitting [his] head and chest on the ground"); *Luckey*, 2016 WL 1128426, at *1–2 ("[Defendant Gafford] then allegedly kicked plaintiff in his groin and stomped into his groin area repeatedly, while Defendant May struck Plaintiff again."). Then, at some point during the grievance process, the plaintiffs were informed that their grievances were being referred to OIG so they could conduct an investigation. *See Hope*, 2015 WL 5190435, at *4 ("[T]he grievance response stated '[y]our allegation of staff abuse has been reported to [OIG] for further investigation.'"); *Luckey*, 2016 WL 1128426, at *10 ("Plaintiff's emergency informal grievance [was] referred to the [OIG] for investigation[.]"). Where these stories deviate is how this message was delivered to each respective plaintiff. In *Hope*, the plaintiff was told that this referral to OIG constituted a "denial" of his grievance, *see Hope*, 2015 WL 5190435, at *4, whereas the *Luckey* plaintiff was informed that he should consider his grievance "approved" because it was sent to OIG, *see Luckey*, 2016 WL 1128426, at *10.

Both *Hope* and *Luckey* involved plaintiff prisoners who alleged physical abuse by prison staff and filed grievances as required. Since the grievances alleged physical abuse, prison officials referred (and were required to refer) the grievances to OIG. *See* Fla. Stat. § 944.35(3)(d) (requiring correctional officials to report any suspected "unlawfu[l] abuse" to OIG, and further requiring OIG to "immediately conduct an appropriate investigation."). The only material difference between these cases is the verbiage of the response each plaintiff received: one said "approved," the other said "denied." *See Luckey*, 2016 WL 1128426, at *11 n.6 ("[In *Hope*], the warden responded to the plaintiff's grievance, informing the plaintiff that his allegation of staff abuse was reported to [OIG] for further investigation, but that his grievance was denied. . . . Here, however, the response to [plaintiff's grievance] explicitly stated that his grievance was approved."). The Court finds it

illogical that two plaintiffs who alleged the same type of violations and had the same result (*i.e.*, referral to OIG) would have different exhaustion outcomes <u>based purely on the language used in the responses they received from prison officials</u>. The exhaustion provision of the PLRA requires a plaintiff to dutifully and rigidly exhaust all available remedies before filing suit—even when "pursuing administrative procedures would be futile." *Higginbottom v. Carter*, 223 F.3d 1259, 1261 (11th Cir. 2000). But the Court will not adopt such a constrained view of the PLRA where the determinative factor in satisfying exhaustion turns on the specific language used by a prison official in response to a grievance.

In this case, the TAC specifically alleges that Plaintiff had filed at least two grievances, TAC at ¶¶ 76–77, and that, in response to those grievances, his "allegations of physical abuse [have] been referred to the [OIG]." Response to Grievance [ECF No. 58] at 42. As the *Luckey* court explained, "Plaintiff already had received the remedy he wanted—investigation—and he was not required to continue appealing his grievance." *Luckey*, 2016 WL 1128426, at *11; *see also, e.g.*, *Jackson v. Lanier*, No. 19-cv-114, 2021 WL 6339036, at *7 (N.D. Fla. Nov. 29, 2021) (finding that plaintiff had exhausted his administrative remedies when "[his grievance] was accepted for review <u>and denied</u> because the subject of Jackson's grievance already had been referred to the OIG." (emphasis added)), *report and recommendation adopted*, 2022 WL 94929 (N.D. Fla. Jan. 10, 2022). The Court is satisfied that the TAC has properly alleged Plaintiff's exhaustion of his remedies under FDOC regulations since "the matter was referred to the [OIG] for review and consideration," obviating the need to complete the usual three-step process to exhaust a grievance. *Lanier*, 2009 WL 1758904, at *1.

### B. Step Two: Defendants Have Shown that Plaintiff Failed to Exhaust His Administrative Remedies Against Sgt. Johnson and Warden Acosta

Having addressed Plaintiff's administrative hurdles, the Court will now consider the

substance of Defendants' exhaustion arguments. *See Turner*, 541 F.3d at 1082–83 ("Once the court makes findings on the disputed issues of fact, it then decides whether under those findings the prisoner has exhausted his administrative remedies."). While both Defendants concede that Plaintiff broadly complained about Sgt. Salmon's use of excessive force to prison officials, *see* Johnson Motion at 4; Acosta Motion at 7–8, they contend that Plaintiff failed to allege that either Sgt. Johnson or Warden Acosta committed any misfeasance in those grievances. *See* Johnson Motion at 4 ("These records, in their entirety are void of any allegation or complaint against [Sgt. Johnson.]"); Acosta Motion at 7–8 ("[No grievance] addressed any issues related to anyone's supervisory liability, the failure to train or supervise staff or the present allegations of widespread abuse that should have put anyone in a supervisory position on notice of the need to do anything.").

Plaintiff acknowledges that he did not specifically name Sgt. Johnson or Warden Acosta during the FDOC grievance stage, but argues that he was not required to name either defendant and that his grievances were sufficiently specific to meet the PLRA's exhaustion requirements. *See* Johnson Response at 5 ("Johnson's argument that Mr. Ham's grievances were *per se* inadequate under the PLRA has been rejected by the Supreme Court"); Acosta Response at 8 ("[B]ecause neither FDOC's grievance procedures nor the PLRA support Warden Acosta's argument, there [is] no legal basis to grant his affirmative defense at the pleading stage.").

Plaintiff's argument revolves around the Supreme Court's decision in *Jones v. Bock*, 549 U.S. 199 (2007). In *Jones*, the Court rejected a rule adopted by several lower courts which "permit[ted] suit only against defendants who were identified by the prisoner in his grievance." *Id.* at 203. The Court noted that the PLRA does not impose a "'name all defendants' requirement" on prisoners. *Id.* at 217. Instead, whether a prisoner has exhausted his claims against a particular defendant is dependent upon "[t]he level of detail necessary in a grievance to comply with the

grievance procedures [which] vary from system to system and claim to claim." *Id.* at 218. In other words, *Jones* stands for the proposition that a prisoner should not be penalized if the applicable grievance procedure may not necessarily require the prisoner to name and identify "particular officials." *See id.* at 218–19; *see also Johnson v. Johnson*, 385 F.3d 503, 522 (5th Cir. 2004) ("[T]he primary purpose of a grievance is to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued."); *accord Parzyck*, 627 F.3d at 1219 (citing *Jones* and *Johnson*).

Since Plaintiff's informal grievance is not part of the record, the Court relies on the following portion of his July 17, 2017 formal grievance to determine exhaustion:

> On June 12, 2017[,] a Sgt at South Florida Reception Center broke my arm by twisting it with anger. He then placed me in handcuffs while my arm was broken for 40 minutes. . . . I believe his real name is Sgt Selmon or Shelmon, something close to that. He then drove me to South Bay facility with a broken arm. Once at South Bay, I was rushed to Lakeside Medical Center and X-rays [were] taken. The [doctor] said that the damage is too dramatic and will require surgery to try and repair.

July 17, 2017 Grievance [ECF No. 58] at 40. This grievance clearly alerted prison officials to the following: (1) Sgt. Salmon used excessive force in way that broke Plaintiff's arm, and (2) the injury he suffered was severe and required surgery. *See id.* Notably absent, however, is any reference to Sgt. Johnson or Warden Acosta, let alone a reference to prison officials being deliberately indifferent and/or failing to train staff. *Id.* This leads the Court to the ultimate question: Did the grievance provide sufficient notice to "alert prison officials" to Plaintiff's claims for failure to intervene, deliberate indifference, and failure to train/supervise? *Parzyck*, 627 F.3d at 1219 (quoting *Jones*, 549 U.S. at 219).

The Court concludes that the answer is "No." While the Court agrees with Plaintiff that FDOC's grievance regulations "mandat[e] no level of detail at all," it is also convinced that "a

standard akin to notice pleading is appropriate when determining whether [Plaintiff's] greivanc[e] contained sufficient details" to properly alert prison officials. *Harvard v. Inch*, 411 F. Supp. 3d 1220, 1239 (N.D. Fla. 2019) (internal citations omitted); *cf. Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001) ("[W]hile notice pleading may not require that the pleader allege a 'specific fact' to cover every element . . . it is still necessary that a complaint contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." (cleaned up)). Nowhere in the July 17, 2017 Grievance does Plaintiff even hint that a prison official other than Sgt. Salmon wronged him in any way. Plaintiff does not allege that a person other than Sgt. Salmon was deliberately indifferent, that any other person observed the alleged use of force, or that there was some lack of institutional control or pattern of abusive behavior which would allow prison officials to surmise a lack of sufficient training or supervision. *See Chandler v. Crosby*, 379 F.3d 1278, 1287 (11th Cir. 2004) ("[T]he purpose of administrative exhaustion . . . is to put the administrative authority on notice of all issues in contention and to allow the authority an opportunity to investigate those issues." (emphasis added)).

All of the parties have provided copious case law from federal courts throughout the country, but the Court finds two cases provided by Warden Acosta to be the most instructive: *Pearson v. Taylor*, 665 F. App'x 858 (11th Cir. 2016) and *Sherman v. Lew*, No. 17-12809-A, 2018 U.S. App. LEXIS 35146 (11th Cir. Dec. 13, 2018). In *Pearson*, the Eleventh Circuit held that a plaintiff failed to exhaust his deliberate indifference claims against three defendants, even though he alleged injuries related to a pepper spraying incident, since "he [did not] include any complaint about a denial of medical care or any injuries he suffered from [the] use of pepper spray." *Id.* at

867. Likewise, in *Sherman*, a federal prisoner brought a *Bivens*[3] claim against three defendants for deliberate indifference and "fail[ing] to properly train and supervise staff." 2018 U.S. App. LEXIS 35146, at *2–3. The court found that the plaintiff failed to satisfy the PLRA's exhaustion requirement for claims against two of the defendants because "none of his administrative complaints contained claims against [them]." *Id.* at *16.[4] In contrast, the out-of-circuit cases relied upon by Plaintiff are unpersuasive and some even cut against his own argument. *See, e.g., Wisenbaker v. Crawford*, 331 F. App'x 494, 495 (9th Cir. 2009) ("The district court properly determined that Wisenbaker did not exhaust as to his claim that the defendants have a policy of coercing inmates . . . given that his grievance made no mention of the alleged coercion."); *Allen v. Eckard*, 804 F. App'x 123, 127 (3d Cir. 2020) (failing to meaningfully address the exhaustion issue because "[the] failure to train claim is meritless"). In short, the Court finds that, while Plaintiff was not required to specifically name Sgt. Johnson or Warden Acosta in his grievance to satisfy the PLRA's exhaustion requirement, he still had to present some factual allegations which would allow a prison official to conclude that a person <u>other than Sgt. Salmon</u> had engaged in improper behavior. *See Chandler*, 379 F.3d at 1287; *Parzyck*, 627 F.3d at 1219.

There is one final issue to address. In *Parzyck*, the Eleventh Circuit noted that "[n]othing in the FDOC's grievance procedures requires inmates to file new grievances addressing every subsequent act by a prison official <u>that contributes to the continuation of a problem already raised</u>

---

[3] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

[4] The Court is cognizant that neither *Pearson* nor *Sherman* involved a prison operated by FDOC; thus, the grievance procedures utilized in these cases could be very different. *See Jones*, 549 U.S. at 218 ("The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it's the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."). Nevertheless, both cases are instructive to show that a plaintiff must provide sufficient factual allegations to place prison officials on notice of the claims against them. *See Pearson*, 665 F. App'x at 867 ("[T]he grievance would not have alerted prison officials to the problem and given them an opportunity to resolve it before being sued." (citing *Parzyck*, 627 F.3d at 1218–19)).

Page **16** of **18**

in an earlier grievance." 627 F.3d at 1219 (emphasis added).  It is true, of course, that Sgt. Johnson and Warden Acosta's alleged actions (or inactions) could be considered a "continuation of a problem already raised"—*i.e.*, Sgt. Salmon's use of force.  *See* Acosta Response at 7 ("Mr. Ham's grievance that Sgt. Salmon used excessive force . . . is interrelated with Warden Acosta's failure to adequately train and supervise Sgt. Salmon[.]").  Although Sgt. Salmon's use of force is the keystone which supports all of Plaintiff's claims, the Court finds that *Parzyck* cannot be read so broadly as to allow a plaintiff to automatically exhaust all other related claims without providing prison officials notice of the facts underlying those claims.  *See, e.g.*, *Arias v. Perez*, 758 F. App'x 878, 881–82 (11th Cir. 2019) (distinguishing *Parzyck* on the basis that "[n]one of Arias's grievances pursued a claim against Hays for failing to protect him, as distinct from requesting protection itself"); *Oliver v. Harden*, No. 11-cv-964, 2012 WL 3290270, at *3 (M.D. Fla. Aug. 13, 2012) ("Although Plaintiff Oliver grieved the matter of lack of supervision of the Day Room and the problem of a screen blocking the officers' view of the Day Room from the control room, the grievance and administrative appeal did not state or suggest that officers paid inmate Olin to attack him."); *Sauder v. Harkin*, No. 18-cv-2192, 2020 WL 1035254, at *3 (N.D. Fla. Jan. 31, 2020) (recommending dismissal of excessive force claims because "[n]owhere in the grievance or appeals did Sauder complain about the use of excessive force.  Rather, he references the 'use of force,' and an 'assault,' generally, only to explain the source of his injuries"), *report and recommendation adopted*, 2020 WL 1034408 (N.D. Fla. Mar. 3, 2020).

Having made the requisite factual findings as required by *Turner*, the Court finds that Defendants have met their burden in showing that Plaintiff failed to exhaust his administrative remedies against both Sgt. Johnson and Warden Acosta.

## CONCLUSION

Based on the foregoing, and having carefully reviewed the record and governing law, it is **ORDERED AND ADJUDGED** that Sgt. Johnson's Motion to Dismiss [ECF No. 72] and Warden Acosta's Motion to Dismiss [ECF No. 80] are both **GRANTED** for failure to exhaust administrative remedies. The **CLERK** is instructed to **TERMINATE** Defendants Johnson and Acosta as parties to this case.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 17th day of May, 2022.

_____
RODOLFO A. RUIZ II
UNITED STATES DISTRICT JUDGE

cc:   Counsel of record